**In re Steve ROLLINS, Debtor.**

**Steven ROLLINS, Plaintiff,**

**v.**

**Diane M. CAMPBELL, Ben Smith, and Frank Baker, Defendants.**

**Bankruptcy No. A93–67408–REB. Adversary No. 93–6598.**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Aug. 20, 1996.

Hirsch Friedman, Atlanta, GA, for Plaintiff.

Dorothy H. Bishop, Robert B. Silliman, Awtrey & Parker, P.C., Marietta, GA, for Defendants.

### ORDER

ROBERT E. BRIZENDINE, Bankruptcy Judge.

Before the Court is Plaintiff–Debtor's complaint alleging, among other things, that Defendants willfully violated the automatic stay provided in 11 U.S.C. § 362(a) and that he is entitled to an award of money damages in-

cluding costs, attorney's fees, and punitive damages as authorized by 11 U.S.C. § 362(h).[1] This matter came on for trial and, based upon the evidence and argument presented, the Court delivered an oral ruling in open court on February 1, 1995, finding and concluding that Defendants violated the automatic stay and that Debtor is entitled to an award of actual damages, including attorney's fees, under Section 362(h). Thereafter, a hearing was conducted on the issue of attorney's fees but no ruling was made thereon. Accordingly, this Order is entered to reduce the Court's prior findings of fact and conclusions of law to written form consistent with the aforesaid ruling. Additionally, within this Order the Court will address the award of attorney's fees to Debtor's counsel.

The issue presented is whether Defendants' efforts to enforce Debtor's payment of a certain child support obligation violated the automatic stay as provided in Section 362(a) of the Bankruptcy Code. Following a plea of nolo contendere in a criminal abandonment action, Debtor was sentenced to 12 months confinement which was suspended principally conditioned upon the payment of child support. Defendants contend they committed no stay violation when they subsequently sought revocation of the suspension of Debtor's sentence and hence his possible incarceration. Defendants argue the damages sought by Debtor in this case are unwarranted because their actions were excepted from the automatic stay as the continuation of a criminal matter under Section 362(b)(1) or were excepted as efforts directed toward the collection of child support in accordance with Section 362(b)(2). Further, whether or not the Court concludes Defendants' actions were subject to and in willful violation of the automatic stay, Defendants maintain this Court should abstain from hearing Debtor's claim for damages under principles of comity. Finally, they assert that their conduct is protected by official and individual qualified immunity as well as sovereign immunity.

## I. Findings of Fact

Debtor and his former wife were divorced pursuant to the Final Judgment and Decree entered by the Superior Court of Cobb County, Georgia on July 13, 1990, which adopted and incorporated a consent agreement between the parties settling all related matters. Under this agreement, Debtor was required to pay the sum of $312 per month for the support and maintenance of the couple's minor child. *See* Exhibits 12 and 13. These payments were to be made directly to the Cobb County Child Support Receiver. Exhibit 13, ¶ 5.[2] On the same date, based upon an affidavit filed by Debtor's former wife, the Magistrate Court of Cobb County issued a criminal warrant against Debtor charging, by reason of Debtor's refusal and failure to support his two (2) year old son for a period in excess of 30 days, that he had abandoned his minor child in violation of O.C.G.A. § 19–10–1. *See* Exhibit 1. The county solicitor, thereupon, formally accused Debtor of the criminal offense of willful, voluntary abandonment of his minor child and commenced an action in the State Court of Cobb County. *State v. Steve Rollins,* Case No. 90M 5028, Exhibit 2.

Debtor waived formal arraignment on October 4, 1990 and, after having failed to appear at several court hearings on the matter, eventually entered a plea of nolo contendere on January 7, 1991 to the offense as charged. *See* Exhibits 3, 6, 7, 8, and 9. Subsequent thereto, Judge Mary Staley of

---

1. Debtor also sought injunctive relief to enjoin the above-named Defendants from proceeding with a probation revocation proceeding against Debtor in the State Court of Cobb County, Georgia. Because Defendants have elected to proceed with their assertions concerning the automatic stay herein instead of continuing their action in the State Court, this Court need not address the issue of injunctive relief. Further, this Court has opined that the imposition of sanctions would probably be a sufficient deterrent as to obviate the need for such relief. In addition, Debtor initially claimed damages for alleged civil rights violations but that claim was subsequently withdrawn without prejudice in open court.

2. As hereinafter amplified, although the Superior Court's Order directs Debtor to make his payments to the Child Support Receiver, Defendants continue to insist herein that Debtor was subsequently on notice to remit such payments to the Probation Office and, thereafter, to the Sentence Enforcement Unit of the State Court of Cobb County.

the Cobb County State Court entered a misdemeanor sentence of 12 months confinement and fined Debtor $240. As authorized by O.C.G.A. § 42–8–34, she suspended Debtor's sentence of confinement on condition that he pay monthly child support in the amount of $312 until his child marries, becomes self-supporting, dies, reaches age eighteen (18), or as otherwise ordered by the court. *See* Misdemeanor Sentence, Exhibit 10; Sentence of Support, Exhibit 11.[3]

The State Court further ordered Debtor to make the aforesaid payments to the Child Support Receiver, comply fully with the remaining terms and conditions of the Superior Court's Order of July 13, 1990, and pay the $240 fine and surcharge before March 6, 1991. *See* Exhibit 11; *see also* Exhibit 10; Bankruptcy Court Transcript of August 16, 1994 (p.m.) (hereafter "Tr. 2") at 92–93 (Debtor).[4] The Sentence Order (Exhibit 11) also provided that Debtor's arrest could be ordered for failure to comply with the terms and conditions set forth therein and, after a hearing, the suspended sentence could be revoked subjecting Debtor to immediate service of his sentence through incarceration. *See* Exhibit 11. As testified by Smith, revocation petitions are used to enforce the terms and conditions of suspension. Bankruptcy Court Transcript of September 27, 1994 (hereafter "Tr. 3") at 15–17 and 90–92.

Before 1992, the Probation Office of the Georgia Department of Corrections handled the supervision of suspended sentences entered in child support cases. Bankruptcy Court Transcript of August 16, 1994 (a.m.) (hereafter "Tr. 1") at 25, 27 (Campbell). In accordance with recent enabling legislation under O.C.G.A. § 42–8–100 (enacted by Ga. L.1991, p. 1135), however, the judges of the State Court of Cobb County established a sentence enforcement unit by Order dated July 23, 1992, which unit reports directly to the judicial council for the Cobb County State Court. *See* Exhibit 36. As a result of the aforesaid enabling legislation and said Order, supervisory authority of misdemeanor

sentences in Cobb County, including child abandonment cases, was transferred from the probation department to the Sentence Enforcement Unit (hereafter "SEU"). Defendants Campbell and Baker are employed by the Cobb County SEU and Defendant Smith is the Cobb County Solicitor.

Under this claim of authority, Defendants assert herein that their duties include supervising suspended sentences in abandonment cases and, therefore, in State Court they have the responsibility for monitoring and collecting child support payments made in connection with a suspended sentence. Tr. 3 at 17, 19–20 (Smith), 151, 155–56 (Baker). In discussing her unit's operating procedure, Campbell testified that the SEU receives child support payments from a payor parent, such as Debtor, which monies are then forwarded to the custodial parent. Generally, if the payments are not received within two weeks of the due date, the SEU notifies the payor parent via letter. Once a delinquency reaches one or two months in duration, SEU employees initiate an enforcement process by filing a petition for revocation of suspension.

Suspended sentences are administratively convenient and economical because they relieve recipient/custodial parents from the burden of having to bring new abandonment charges each month a payor parent fails to pay child support. Further, in the case of a civil divorce decree, custodial parents can avoid enforcing child support through the filing of contempt actions in the Superior Court. Defendants herein favor the use of suspended sentences because it places a powerful tool at their disposal for handling child support arrearage cases. Tr. 3 at 83–85 (Smith). Once a parent is convicted of the offense of abandonment and is placed under a suspended sentence, the SEU and/or the county solicitor use the threat of confinement through revocation of suspension to motivate and enforce compliance when a payor parent fails to make the required child support payments. Tr. 1 at 50, 51 (Campbell). Practically speaking, payor parents, like Debtor

---

3. In 1989, the provisions for suspending sentences in abandonment cases were moved from O.C.G.A. § 42–8–34(d)(1)–(4) to O.C.G.A. § 19–10–1(j)(1)–(4). *See* Ga.L. 1989, p. 381.

4. Apparently, Debtor was also ordered to pay a probation supervisory fee in the sum of $10 for two months. Exhibit 10.

herein, face the prospect of numerous incarcerations but only infrequently are such parents actually incarcerated and seldom serve a sentence to its conclusion. Moreover, because Debtor's sentence was suspended pending his child's minority, he will conceivably live under threat of incarceration until his son reaches eighteen (18) years of age. Tr. 3 at 16, 24, 56 (Smith); Tr. 1 at 47, 48; Tr. 2 at 25–26 (Campbell).[5]

After the SEU was created and had assumed responsibility from the probation office for child support collection and enforcement of suspended sentences in abandonment cases, Debtor fell behind in his child support payments. Defendant Campbell brought a petition for revocation of sentence in the State Court of Cobb County on April 5, 1993, same being styled *State v. Steve Rollins,* Case No. 90M 5028 (Exhibit 21), claiming that Debtor had failed to pay monthly child support totalling $2,843, and a hearing to show cause was scheduled for May 10, 1993.[6] Debtor, however, failed to appear on May 10; whereupon, Campbell submitted an affidavit to the court for authority to have Debtor arrested based on his failure to appear at the show cause hearing and because he was in arrears for child support in the amount of $3,155 ($2,843 plus one additional month's child support of $312). *See* Exhibit 22. Based on Campbell's affidavit and under authority of O.C.G.A. § 19–10–1, Judge Melodie Clayton ordered Debtor's arrest on May 10, 1993. *See* Exhibit 26; Tr. 1 at 82 (Campbell).

When a defendant fails to appear at such a hearing, Campbell testified, she typically reports to the judge that she has confirmation of the receipt of the petition by a defendant and asks for issuance of an arrest warrant. Campbell further testified, however, that the revocation petition in question, sent to Debtor by certified mail, had been returned as unclaimed. Tr. 2 at 39–40. It is unclear whether Judge Clayton was ever informed of this fact and no mention of same is made in Campbell's affidavit. *See* Exhibit 22. Campbell admitted she would seek a warrant even if a petition had been returned as unclaimed, as in this case, even though the defendant may have no notice of the show cause hearing. Tr. 2 at 40.

Debtor became aware of the warrant and subsequently appeared in Campbell's office to discuss the matter on or about May 13, 1993. Tr. 1 at 67–68, 126, 155; Tr. 2 at 44–48 (Campbell); Tr. 2 at 101 (Debtor). After Campbell consulted with Baker, the decision was made to recall the arrest warrant and require Debtor to appear at another hearing. Tr. 3 at 173–74 (Baker). The arrest warrant and Order issued by Judge Clayton authorizing Debtor's arrest were recalled by Campbell on May 13, 1993 without any judicial intervention and a new court date was set for May 24, 1993. *See* Exhibits 22 and 26; Exhibit 21 at 2; Tr. 1 at 127; Tr. 2 at 44–48 (Campbell); Tr. 3 at 174 (Baker).

Smith stated to this Court that the SEU does not have authority to recall arrest warrants issued by a judge with respect to revocation petitions. Tr. 3 at 41–44, 54–56 (Smith). Campbell testified, however, that they do have the ability to retrieve an original warrant from the sheriff's department and strike through it. Tr. 2 at 48 (Campbell). Moreover, as previously mentioned, in this case Campbell on her own authority recalled the warrant in question and the order of arrest issued by Judge Clayton.[7] Indeed, Judge Clayton did not review the matter nor was she even made aware that her arrest order had been recalled by Camp-

5. By contrast, as discussed hereinafter, because probation is a form of service of a sentence, if Debtor had been placed on probation instead of having his sentence suspended, the maximum period of time for which he would be subject to incarceration would be 12 months less any time served on probation. *See* Tr. 3 at 27–33 (Smith).

6. Campbell indicated that she is provided with alternative dates for the setting of show cause hearings on the revocation calendar. Campbell testified, in effect, that she or her supervisor are allowed to schedule such matters without judicial supervision and can, therefore, order someone to appear in court to answer the charges in question. Tr. 2 at 37–39.

7. Similarly, David McBrayer, a probation officer who monitored Debtor's compliance with his suspended sentence prior to Campbell, recalled a warrant issued against Debtor on September 27, 1991. *See* Tr. 1 at 147 and 149. (Campbell).

bell and Baker. Tr. 1 at 67–68; Tr. 2 at 48–49, 51–52, 128–30 (Campbell).

Debtor filed a petition under Chapter 13 of the Bankruptcy Code on May 20, 1993. In his bankruptcy schedules, Debtor listed Child Support Recovery as a creditor with a child support arrearage claim of $3,000. Meanwhile, the hearing scheduled in State Court for May 24, 1993 was held over one day so that Debtor's bankruptcy counsel could be present. Tr. 1 at 126–27, 155–57; Tr. 2 at 45 (Campbell); State Court Transcript of May 24, 1993 (Exhibit 44). Debtor testified he discussed the matter with Campbell and Baker on May 24, informing them of his bankruptcy filing, and that Baker allegedly responded he did not care about the filing because Debtor was going to jail if he did not pay what he owed. Tr. 2 at 78–79 (Debtor); *see also* Tr. 2 at 68–69 (Maurene Rollins). Baker, however, did consult with Smith about the implications of the bankruptcy filing. Tr. 3 at 177–81, 191. On May 25, 1993, the State Court of Cobb County conducted a hearing on the revocation of Debtor's suspended sentence. Tr. 1 at 63–65. In view of Debtor's bankruptcy petition, Judge Clayton ruled that the matter would be stayed pending further legal research and presentation of argument by the solicitor's office concerning the automatic stay. State Court Transcript of May 25, 1993 at 9 (Exhibit 24); Tr. 1 at 86, 98, 157 (Campbell).

Debtor's Chapter 13 repayment plan provided for funding from all future earnings or income of the Debtor, which earnings and income were submitted to the control of this Court and the Chapter 13 Trustee. Further, the plan provided that Debtor would make direct payments to satisfy his current child support obligation and the prepetition child support arrearage would be paid in full through the plan. By Order of July 20, 1993, this Court confirmed Debtor's plan. Campbell acknowledged that, since the filing of

Debtor's bankruptcy case, she had already received payments totalling $129.16 from the Chapter 13 Trustee on the prepetition child support arrearage claim. Tr. 2 at 44 (Campbell).[8]

Instead of having the matter placed back on the State Court calendar, Smith subsequently caused to be prepared a second petition for revocation which was filed on August 3, 1993. *See* Exhibit 25; Tr. 1 at 81, 85, 87–88, 90–93, 98–99, 118, 131; Tr. 2 at 34; (Campbell); Tr. 3 at 35–37, 69–70, 73, 104–05 (Smith); Tr. 3 at 177–78, 181 (Baker). Based on his research of the law, Smith stated he believed the filing of the second, separate petition seeking Debtor's incarceration would not violate the automatic stay. The grounds for the new petition included Debtor's alleged failure to pay his monthly child support in the amount and manner provided in the Superior Court's Order of July 13, 1990 and to pay his fine. Additionally, the SEU alleged that Debtor did not obtain permission to move or provide any notification concerning his new address. It was further alleged that a post-petition arrearage had accrued since Debtor's bankruptcy filing and that Debtor had failed to make a child support payment from May 13 through June 22, 1993, which nonpayment constitutes abandonment of his child by leaving same in a dependent condition for a period of more than thirty days. *See* Exhibit 25; Tr. 1 at 96–110, 113–14 (Campbell).

Debtor disputed the above allegations. For instance, Maurene Rollins, Debtor's present wife, testified she informed Campbell prior to the hearing on May 24, 1993, that they had not moved but only the name of their street had been changed. Tr. 2 at 67–68. Debtor similarly testified before Judge Clayton at the May 24, 1993 hearing that he had not moved. Exhibit 44 at 12–13. Further, Debtor testified before this Court that

---

**8.** On September 20, 1993, the Cobb County Probation Office filed a proof of claim in the sum of $3,080 for the arrearage. Thereafter, an amended claim for this arrearage, reflecting receipt of $357.53, was filed on March 20, 1995 by the State Court of Cobb County, c/o Sentence Enforcement Unit, in the sum of $2,722.47. In addition, Bonny Rollins, Debtor's former wife and the mother of his child, filed two claims, c/o Sentence Enforcement Unit of the Cobb County State Court, on April 18 and May 5, 1995, in the amounts of $3,080 and $3,081, respectively. These claims were filed in connection with this Court's Order resolving an objection to proof of claim, as entered on April 20, 1995, which addressed a dispute over the proper claimant in this matter.

he had paid the fine in question to the probation office. Tr. 2 at 89–90. Regarding allegations of Debtor's missed payments during the period from May 13, 1993 through June 22, 1993 (Count IV, Exhibit 25), Maurene Rollins testified she brought in a payment on June 9, 1993, not June 23, 1993, as claimed by the SEU. Tr. 2 at 64–66. It is somewhat unclear from Ms. Rollins' testimony to which office she delivered this payment. Debtor's payment record also reflects that several payments were made in June and July, 1993, after the filing of the bankruptcy case and before the filing of the second revocation petition. *See* Exhibit 15.[9]

At a hearing in State Court on August 23, 1993, prior to addressing any of the disputed allegations, Judge Clayton inquired into the reason for the filing of the second petition before the issue of her authority to hear the first revocation petition had been resolved. *See* State Court Transcript of August 23, 1993 at 4–6 (Exhibit 27). In response, Smith advised the court, by reason of the filing of the within adversary proceeding and even though his research indicated the automatic stay did not apply, that he had now decided to try the automatic stay issue before the Bankruptcy Court; whereupon, Judge Clayton again took the matter off her calendar. *Id.* at 6–8. Debtor's sentence was not modified and he was not incarcerated as a result of either revocation petition.

## II. Conclusions of Law

### A. *Purpose of the Automatic Stay*

As mentioned hereinabove, the issue before the Court is whether Defendants violated the automatic stay of 11 U.S.C. § 362(a) by continuing and/or initiating the aforesaid state court actions on or about May 25 and August 23, 1993, and if so, whether or not such violation(s) were willful and thereby

warrant an award of money damages, including attorney's fees, as authorized by Section 362(h).[10] In addressing this issue under the facts presented herein, the Court must also determine whether Defendants' conduct was excepted from the stay under Section 362(b)(1) or (b)(2) and whether Defendants are entitled to qualified immunity.[11]

■ Federal law provides, among other things, that upon the filing of a petition for bankruptcy relief, commencement or continuation of all judicial and other actions or proceedings against a debtor which could have been commenced before, or seek the recovery of a claim that arose prior to, such filing are automatically stayed under Section 362(a). Hence, not only does this stay arise by statute without any court action, but Congress has also made it far-reaching in nature. The automatic stay permeates the very fiber of the Bankruptcy Code and its fresh start concept and, in terms of its broad scope, there is virtually no other provision like it in the law. Once a bankruptcy case is commenced, conflicting interests intervene and must be accommodated as a debtor's creditors, along with other claimants and interested parties, are entitled to assert their rights and claims against the debtor and/or property of his bankruptcy estate. Centralization of such activities is essential because, otherwise, a debtor would be forced to defend himself simultaneously in a multitude of forums. Further, the expansive scope of the stay complements the Court's exclusive jurisdiction over the property of the debtor as defined in the Code. *See* 28 U.S.C. § 1334(e); *see also* 11 U.S.C. §§ 541 and 1306.

■ Such control, though critical to the efficient operation of the bankruptcy process and realization of the goals established by Congress, is not unlimited. In addition to

9. Further adding to the confusion, as previously mentioned in note 2 herein, both the Superior Court order, incorporating Debtor's divorce agreement, and the State Court sentencing order directed Debtor to make his child support payments to the Child Support Receiver. *See* Exhibits 10, 11, 12, and 13.

10. The Court will concentrate primarily upon the second revocation petition for purposes of deter-

mining whether Defendants willfully violated the automatic stay.

11. Although Defendants initially asserted the defense of sovereign immunity, counsel later acknowledged it does not apply to the individuals herein. *See* Bankruptcy Court Transcript of October 24, 1994 at 27.

the right of creditors to participate in the bankruptcy process through which payments are made on allowed claims, Congress has provided an expeditious and inexpensive means for creditors to seek relief from the stay as provided in 11 U.S.C. § 362(d).[12] Under Section 362(e), the automatic stay is terminated with respect to a moving party within thirty (30) days unless the bankruptcy court orders it continued following a preliminary hearing or unless extended by agreement. In addition, certain specific exceptions to the stay are set forth in Section 362(b). Consistent with the foregoing, however, this Court should be approached to resolve any uncertainties regarding the effect of the automatic stay before the institution or continuation of any action against the debtor, his property, or the property of his bankruptcy estate. The bankruptcy court is the only court possessing an all-inclusive view of a debtor and his property. Thus, this court is in the best position to make determinations regarding the stay as the Debtor attempts to reorganize his financial affairs, while at the same time preventing his assets from being taken apart piecemeal without any overall consideration of the resulting effect upon the respective rights and claims of all interested parties.

 Although relief from the stay can be obtained in an accelerated manner, the automatic stay is not a mere formality and the consequences can be severe if a party is found to have taken actions in violation of the stay. *See Rogers v. Overstreet (In re Rogers)*, 164 B.R. 382, 388 (Bankr.N.D.Ga.1994).

For example, a claimant who knowingly attempts to collect or enforce his claim against a debtor or his property without obtaining prior court approval may be liable for damages under Section 362(h). Additionally, because good faith is not a defense under this provision, a determination that a claimant's acts amount to a willful violation of the stay is not altered by a claimant's good faith, but erroneous, belief that his acts were not stayed. *See Goichman v. Bloom*, 875 F.2d 224 (9th Cir.1989); *see also University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1088 (3d Cir.1992) (cites omitted).

## B. *Exceptions to the Automatic Stay—11 U.S.C. §§ 362(b)(1) and 362(b)(2)*

Defendants argue that their efforts to compel Debtor to pay his child support obligation by seeking revocation of the suspension of his sentence constitute the continuation of a prosecution of a criminal offense under state law. Similarly, they contend, the Eleventh Circuit Court of Appeals has directed bankruptcy courts to tread softly in areas involving domestic relation issues and not get involved in or interfere with such matters. *See Carver v. Carver*, 954 F.2d 1573, 1579 (11th Cir.), *cert. denied*, 506 U.S. 986, 113 S.Ct. 496, 121 L.Ed.2d 434 (1992).[13] Thus, Defendants assert their actions against Debtor, through the filing of the second revocation petition, were excepted from the automatic stay in accordance with Section 362(b)(1)

12. A sixty dollar ($60.00) filing fee is required to file a motion for relief from stay which could impose a burden in some instances upon indigent former spouses seeking to recover support. A recent amendment to the Bankruptcy Code could provide relief from this financial burden in certain instances insofar as such spouses or custodial parents or other child support creditors would have standing to appear and intervene without charge by filing a motion under 28 U.S.C. § 1930(b), Judicial Conference Schedule of Fees, Item (21). *See* Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, § 304(g), 108 Stat. 4106 (1994). These amendments were signed into law by the President on October 22, 1994.

13. In *Carver*, the Eleventh Circuit vacated a damages award in excess of $18,200 arising from a violation of the automatic stay and concluded

that the bankruptcy court should have abstained from considering such claim. The court did not hold, however, that the automatic stay is inapplicable to civil contempt suits to collect delinquent alimony payments and/or child support during bankruptcy. In fact, the Eleventh Circuit emphasized that relief from stay should be obtained in accordance with Section 362(d) before such action is undertaken and, given the expansive definition of property of the estate in Chapter 13, that the Section 362(b)(2) exception is most likely to be of little consequence. *Carver*, 954 F.2d at 1576–78. In addition, although at least one court has questioned the value of *Carver* as precedent (*Lawson v. Lackey (In re Lackey)*, 148 B.R. 626, 630 (Bankr.N.D.Ala.1992)), this Court follows *Rogers v. Overstreet*, 164 B.R. at 389, in continuing to recognize *Carver* as good authority.

and/or (b)(2).[14] Based on the following discussion, however, this Court concludes that neither exception is applicable herein.[15]

■ Taking the latter provision first, Section 362(b)(2), the Court finds that Defendants' efforts were directed against the Debtor personally and specifically calculated to pressure him into paying his prepetition child support arrearage from property of his bankruptcy estate. As stated in *Carver*, exceptions such as Section 362(b)(2) must be carefully construed because, although it excepts the collection of alimony, maintenance, or support from the automatic stay, this exception is limited to collection efforts directed against property that is not property of the estate. As recognized by the Eleventh Circuit, unlike a case under Chapter 7, property of the estate in a case filed under Chapter 13 specifically includes a debtor's post-petition earnings. *See Carver*, 954 F.2d at 1577; *see also* 11 U.S.C. §§ 541(a)(6) and 1306(a)(2). In sum, Section 362(b)(2) is narrow in scope and applies solely to the collection of child support against property of the debtor that is not property of the estate and, accordingly, this exception does not shield Defendants' conduct in the present case. *See generally Carver*, 954 F.2d at 1577; *Rogers*, 164 B.R. at 387; *see also In re Walter*, 153 B.R. 38, 40 (Bankr.N.D.Ohio 1993); *Gaertner v. Choske (In re Henry)*, 143 B.R. 811, 814 (Bankr. W.D.Pa.1992).

■ A more difficult question is presented by Defendants' contention that their efforts in collecting child support were within the exception set forth in Section 362(b)(1) as the continuation of a criminal matter. Although child support obligations arising from divorce decrees are undoubtedly civil in nature, Defendants assert this matter rose to the level of criminal conduct when Debtor entered a plea of nolo contendere in response to the charge of willful abandonment. Under Georgia law as set forth in O.C.G.A. § 19–10–1, a parent is guilty of a misdemeanor when said parent "willfully and voluntarily abandons his or her child ... leaving it in a dependent condition...." O.C.G.A. § 19–10–1(b) (Michie 1991).[16] Upon conviction or entry of an appropriate plea, the court may conditionally suspend a sentence of confinement pending compliance with an obligation to pay child support during the minority of the abandoned child. O.C.G.A. § 19–10–1(j) (formerly codified at O.C.G.A. § 42–8–34(d) (*see* Ga. L.1989, p. 381)); *see also* O.C.G.A. § 17–10–3(a) (Supp.1995) (punishment for misdemeanor).

Defendants insist, even though a private individual is intended as the ultimate recipient of Debtor's child support payments, that Debtor's obligation to remit same to the SEU was nevertheless required as part of his criminal sentence.[17] Thus, Defendants contend, their enforcement of Debtor's monetary obligation, imposed as an alternative to confinement, constitutes the continuation of an ongoing criminally-based process. Accordingly, Defendants argue they were excused under the exception provided in 11 U.S.C. § 362(b)(1) from the requirement of seeking relief from the automatic stay prior to initiating the second revocation action.

In support of their contention, Defendants cite, among others, the case of *In re Sims*, 101 B.R. 52 (Bankr.W.D.Wis.1989). In *Sims*, the court held that enforcement of a jail sentence following a debtor's failure to pay a

---

14. These provisions state as follows:

 (b) The filing of a petition ... does not operate as a stay—
 (1) under subsection (a) of this section, of the commencement or continuation of a criminal action or proceeding against the debtor;
 (2) under subsection (a) of this section—

 . . . .

 (B) of the collection of alimony, maintenance, or support from property that is not property of the estate....
11 U.S.C. § 362(b)(1) and (b)(2)(B).

15. As previously stated in note 10 herein, the Court will restrict its analysis to the Defendants' filing of the second revocation petition.

16. A child is considered to be in a dependent condition under this provision "when the father or mother does not furnish sufficient food, clothing, or shelter for the needs of the child." O.C.G.A. § 19–10–1(a).

17. As previously mentioned, Debtor was specifically directed to comply with the terms of the divorce decree which required payments to be made to the Cobb County Child Support Receiver.

fine or monetary penalty constituted the continuation of a criminal action under Section 362(b)(1). 101 B.R. at 56. This fine had been imposed against the debtor in a state criminal proceeding in lieu of incarceration and was subsequently consolidated into a civil forfeiture award for purposes of payment. The debtor was later arrested for failing to make said payments but, because he had filed a petition under Chapter 13, he sought damages for violation of the automatic stay.

In ruling that the contested acts came within the Section 362(b)(1) exception, the court recognized that under applicable state law the second action was not criminal in nature. The court decided, however, that consolidation of the prior criminal fine with the civil forfeiture matter did not alter the character of the original criminal action. 101 B.R. at 54. The court further rejected the debtor's argument that confinement was nothing more than an attempt to enforce a money judgment. Even though the criminal sanctions sought by the government related to conduct that might also support civil liability, the court concluded the government was principally seeking to advance punitive and deterrent goals within the criminal justice system which Section 362(b)(1) is designed to protect. *Sims*, 101 B.R. at 55.[18]

After carefully reviewing the *Sims* decision and though it helps to frame certain issues for decision herein, this Court concludes *Sims* is factually distinctive and its rationale is not applicable herein. For instance, unlike *Sims*, in the present case the obligation Defendants sought to enforce did not originally arise as the result of a criminal proceeding, but arose as part of an agreement in a civil divorce proceeding. Moreover, as discussed

hereinafter, in attempting to enforce and collect child support through their filing of the second revocation petition, Defendants were seeking to promote goals more civil and remedial in nature than punitive or deterrent as held in *Sims*.

Obviously, abandonment is a criminal offense, but this Court is not confronted with the question of whether abandonment is a crime under Georgia law. Instead, this Court must decide whether Defendants' actions in enforcing the terms by which Debtor's sentence was suspended constitute the continuation of a criminal matter within the meaning of Section 362(b)(1). Based upon the reasoning that follows, this Court concludes that Defendants' conduct does not fall within this exception. An analysis of Georgia statutory and case law compels this conclusion. Further, the examination of civil and criminal contempt that follows herein is helpful in construing what is the continuation of a criminal matter for purposes of Section 362(b)(1). Before beginning these discussions, however, this Court will address certain comity concerns implicated herein.

### C. *Comity*

■■■ This Court understands that through operation of the state criminal process, Debtor was charged with a criminal offense, his guilt was determined, and his sentence was imposed and suspended as provided in O.C.G.A. § 19–10–1. The Court acknowledges the breadth of state criminal proceedings and is mindful of the United States Supreme Court's admonition in *Kelly v. Robinson*, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986), that great deference is to be accorded to states in the prosecution of criminal matters.[19] This Court is also aware that

---

**18.** In reaching this conclusion, the court in *Sims* held, whereas Section 362(b)(5) relates to civil actions, Section 362(b)(1) alone governs criminal matters. 101 B.R. at 55. Section 362(b)(5) provides in pertinent part that "the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power" is not subject to the automatic stay. 11 U.S.C. § 362(b)(5). Section 362(b)(5) does not qualify Section 362(b)(1) because the former does not encompass criminal penalties and to read it otherwise would render Section 362(b)(1) a nullity. *See 134 Baker Street,*

*Inc. v. Georgia,* 47 B.R. 379, 380–81 (N.D.Ga. 1984). Section 362(b)(5) is not asserted herein and is addressed only in the context of determining the scope of Section 362(b)(1).

**19.** The decision in *Kelly* is a good example of the importance of the purpose of the underlying proceedings in terms of determining the nature of a monetary obligation imposed as a condition of probationary sentence. In *Kelly*, the Supreme Court held that a restitution obligation, though distinguishable from a traditional criminal fine intended as punishment, constituted a criminal

some courts are critical of any investigation into whether a money obligation or fine imposed in connection with a criminal sentence is truly criminal. This type of inquiry is deemed unwarranted because fixing and policing of monetary obligations, when attached as alternative terms of punishment as in cases of probation, which in some ways is similar to suspension, are integral parts of the state court criminal process. *See United States v. Caddell,* 830 F.2d 36, 39, *reh'g denied,* 833 F.2d 1010 (5th Cir.1987); *In re Corbo,* 117 B.R. 109, 112 (Bankr.D.N.J.1990); *Birk v. Simmons (In re Birk),* 108 B.R. 657, 659–61 (Bankr.S.D.Ill.1988); *In re Gilliam,* 67 B.R. 83, 87 (Bankr.M.D.Tenn.1986); *see also 134 Baker Street,* 47 B.R. 379.[20] Notwithstanding the foregoing concerns, given the hybrid nature of the process at issue, this Court concludes that inquiry into the actual character of Defendants' actions in this case is necessary and is not precluded by comity.

This inquiry is not intended, however, to displace the efforts of state courts to enforce either their jurisdiction or the criminal laws of the state in which they serve. The present case does not relate to actions by a court to vindicate its authority, to uphold its dignity or the integrity of its orders, or to enforce its prepetition determination of guilt and corresponding unconditional imposition of punishment. Instead, this matter pertains to Defendants' efforts in enforcing the collection of child support following the filing of a bankruptcy petition.[21] Although Debtor's sentence of incarceration constituted the response of the Cobb County criminal judicial system to his conduct, its execution was suspended precisely in order that it could be employed by state officials as a means of enforcing his obligation to pay child support.

■ Comity does not invariably counsel deference to state proceedings to the complete exclusion of any consideration of affected federal interests. As recognized in *Pennsylvania Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 560–61, 564, 110 S.Ct. 2126, 2131–32, 2133, 109 L.Ed.2d 588 (1990), although the automatic stay can have an intrusive effect on state criminal proceedings, the interests implicated when a person files for bankruptcy relief under Chapter 13 cannot simply be ignored. *See also Washington v. Hale (In re Hale),* 146 B.R. 807, 809–10 (Bankr.E.D.Ark.1992).[22] Further, as held in *Farmer v. Cole (In re Farmer),* 150 B.R. 68, 69 (Bankr.N.D.Ala.1991), incarceration efforts initiated after the filing of a bankruptcy petition and intended to coerce a debtor to use property of the estate to satisfy a prepetition support and alimony arrearage is not excepted from stay under 11 U.S.C. § 362(b)(2). *See also Bible v. Bible (In re Bible),* 110 B.R. 1002, 1006 (Bankr.

penalty rather than compensation for the victim's actual loss because the purpose of the underlying proceedings was to promote the state's interest in the offender's punishment and rehabilitation. Thus, the obligation in question was nondischargeable under Chapter 7 by virtue of 11 U.S.C. § 523(a)(7). *Kelly,* 479 U.S. at 52–53, 107 S.Ct. at 362–63.

**20.** As observed in *Caddell,* restitution, like a fine, can be intended as a penal sanction imposed as a condition of probation. 830 F.2d at 39.

**21.** As discussed in the analysis of civil and criminal contempt which follows herein, the ruling in cases such as *O'Brien v. Nachtigal (In re O'Brien),* 153 B.R. 305 (D.Or.1993), demonstrate the importance of the particular factual setting in reaching determinations as to the purpose of the proceedings in question. There, it was held that a post-petition show cause hearing, based on prepetition failure to execute mortgages as ordered by a state court, did not violate the auto-

matic stay. The hearing's purpose was to decide whether the debtor was in contempt by virtue of his prepetition conduct, not to collect on a property settlement. 153 B.R. at 307. Hence, collection motives can be analyzed while honoring another court's efforts to enforce its own orders. *Accord Hucke v. Oregon,* 992 F.2d 950, 953–54 (9th Cir.), *cert. denied,* 510 U.S. 862, 114 S.Ct. 178, 126 L.Ed.2d 137 (1993).

**22.** The portion of the Supreme Court's decision in *Davenport* pertaining to the dischargeability of restitution obligations arising from a criminal proceeding has been overturned by statutory amendment in 11 U.S.C. § 1328(a)(3). The portion of the opinion concerning the possibility of a distinction between prosecution of a criminal offense and the enforcement of restitution orders by probation officials to collect a debt during bankruptcy, however, is arguably good law. *See Washington,* 146 B.R. at 809 n. 2; *see also Johnson v. Home State Bank,* 501 U.S. 78, 83 n. 4, 111 S.Ct. 2150, 2154 n. 4, 115 L.Ed.2d 66 (1991).

S.D.Ga.1990).[23] Civil debt collection may exist in the guise of criminal enforcement and, no matter how laudatory the efforts to collect same, it should be identified and treated as such consistent with the automatic stay and the exceptions thereto.

### D. Enforcement of Child Support Through Revocable Suspended Sentence Analogous to Civil Contempt

One of the difficulties in determining whether enforcement of a suspended sentence in an abandonment case constitutes a criminal matter under Section 362(b)(1) is that such enforcement seems to be directed at both punishing a delinquent parent as well as compelling performance of a civil duty. Because the imposition of sanctions for civil contempt is very similar to the enforcement of the payment of child support ordered as a condition for suspension of a sentence of incarceration in an abandonment case, the distinction drawn between civil contempt and criminal contempt provides a logical framework for analyzing the issue at hand.

For instance, the line of reasoning used in *Ensley v. Ensley*, 239 Ga. 860, 238 S.E.2d 920 (1977), furnishes certain insights into the problem confronted by this Court in determining the purpose of Defendants' actions. In reviewing Georgia case authority, the court in *Ensley* observed that both civil contempt and criminal contempt share the same power base. Civil contempt is initially concerned with punitive aspirations and is thus

like criminal contempt because it arises in response to disobedient conduct. In the case of an order to pay money, the power to order imprisonment for civil contempt rests not upon the failure to pay a debt, but upon the willful refusal of a party to obey a court order. *Ensley*, 239 Ga. at 862–63, 238 S.E.2d 920, citing *Carlton v. Carlton*, 44 Ga. 216, 220 (1871). Likewise, willful disobedience of a court order to pay child support, a matter in which society has a significant concern, provides the basis for a court's power to imprison a defendant for civil contempt under O.C.G.A. § 19–6–4 (1991). *See McKenna v. Gray*, 263 Ga. 753, 438 S.E.2d 901 (1994); *see also Wilson v. Chumney*, 214 Ga. 120, 103 S.E.2d 552 (1958); *accord Costa v. Costa*, 249 Ga. 494, 292 S.E.2d 73 (1982); *Lewis v. Lewis*, 80 Ga. 706, 6 S.E. 918 (1888) (stressing public interest in duty to comply with a private alimony obligation while asserting court's power to compel same through imprisonment). In short, disobedience is common to both civil and criminal contempt and, in this regard, they look very similar.

Substantial differences exist, however, between civil and criminal contempt such as the procedural protections that are implicated depending upon which form of contempt is in issue. As stated in *Stovall v. Stovall*, 126 B.R. 814 (N.D.Ga.1990), the purpose of a court's order is controlling in deciding whether a contempt citation is civil or criminal.[24] *See also Rook v. Rook (In re*

23. Though stated in another context, and although the case in which it arose was ultimately reversed, the observation offered in *In re Taylor*, 16 B.R. 323, 326 (Bankr.D.Md.1981), *rev'd*, 44 B.R. 548 (D.Md.1984), remains pertinent. In that case, the court concluded that it could not properly abdicate its role in determining whether a criminal proceeding was in essence a means for collecting a civil debt; otherwise, "an intolerable distortion of the elaborate machinery of the bankruptcy laws devised to fix the rights of creditors against the Debtor and the Debtor's property would be created." 16 B.R. at 326; *see also* 1 DAVID G. EPSTEIN ET AL., BANKRUPTCY § 3–20, at 213 n. 41 (1992).

24. The purpose of the citation is even more indicative than the nature of the overall proceedings. For example, an order entered in a civil matter, intended to uphold the court's dignity, could be considered criminal in nature and excepted from stay under Section 362(b)(1). *US*

*Sprint Comm. v. Buscher*, 89 B.R. 154, 156 (D.Kan.1988); *see also N.L.R.B. v. Sawulski*, 158 B.R. 971, 976–77 (E.D.Mich.1993). *Sawulski* further illustrates that, although an order of confinement may be conditional as when a defendant may be released upon payment of a fine, the fine is nonetheless part of the sentence. The fine is paid to avoid jail, not in order to fulfill some previously prescribed duty. 158 B.R. at 974, 976–77. In other words, one way or another, an unconditional penalty is being imposed to vindicate the court's authority with the defendant choosing which form of punishment will be actually applied or served.

Such a situation is distinguished from civil contempt in which an act can be performed, such as the payment of a certain monetary sum as previously directed by a court, to avoid a fine or sentence of imprisonment. The fine or imprisonment is imposed as a means of coercing performance. Similarly, as recognized in *Bible*,

*Rook),* 102 B.R. 490 (Bankr.E.D.Va.1989), *aff'd,* 929 F.2d 694 (4th Cir.1991).[25] The true distinction between these forms of contempt is what they are meant to accomplish as a response to such disobedience, to wit: motivating future performance of a prescribed duty or punishment for a completed past offense. The salient point revealed by the above Georgia cases is that the purpose of the contempt order, in terms of either punishment or enforcement of a specific obligation, is in large part determined by the conditional or unconditional nature of the court's ruling.

In sum, the difference between civil contempt and criminal contempt depends upon whether the sentence is conditioned upon performance of a specific act (civil) or whether it consists of a determinate, unconditional period of confinement or fine (criminal). *Ensley,* 239 Ga. at 863, 238 S.E.2d 920, citing *Davis v. Davis,* 138 Ga. 8, 10, 74 S.E. 830 (1912). Although the power to order conditional imprisonment arises as the result of disobedient conduct, the object in civil contempt is not to punish an act done in contempt of the court, but to compel the doing of an act deemed necessary by the court. *Davis,* 138 Ga. at 10, 74 S.E. 830, quoting *Cobb v. Black,* 34 Ga. 162, 166–67 (1865). The power of imprisonment is used to compel obedience. Once the contempt is purged and the end of the law achieved, which is enforcement of the obligation in question, a defendant can no longer be held in confinement. *Davis,* 138 Ga. at 12–13, 74 S.E. 830. Hence, a parent like the Debtor herein always has the ability to purge himself of civil contempt by paying what he owes and complying with the court's order; whereupon, he may obtain his release from custody. By contrast, summary punishment, either through imprison-

ment or fine for resistance to the court's authority, is ordered to punish the contemptuous party and deter future similar misconduct by others. In that case, the offending act has been done or completed and once punishment is ordered, the matter is at an end. *Id.* at 12, 74 S.E. 830.

The principled distinction between civil contempt and criminal contempt is useful to understanding and applying 11 U.S.C. § 362(b)(1) to the facts presented herein. In this case, after Debtor's entry of a nolo contendere plea, punishment was basically imposed through a sentence of 12 months confinement because one of the functions of the abandonment statute is to punish those who willfully abandon and fail to support their children. *Chapman v. State,* 181 Ga.App. 320, 352 S.E.2d 216 (1986). But, as a result of its suspension conditioned upon, among other things, payment of child support and full compliance with the Order of the Superior Court, this sentence as suspended was used by the SEU to enforce Debtor's moral duty as a parent and to facilitate the collection of child support. Unlike *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, the monetary obligation in question was not imposed as a part of Debtor's sentence as a criminal sanction but, in fact, antedated the sentence and was not a form of punishment as discussed hereinafter.

Although tantamount to a sentence of conditional liberty, the suspension of punishment as experienced by the Debtor in this case is civil or remedial in that it is designed to compel obedience. Such coercion through the threat of incarceration, by execution or commencement of sentence, was tied to prospective compliance as opposed to the imposi-

110 B.R. at 1005–06, although a court may impose imprisonment for contempt, such imprisonment may be remedial as well as punitive. If it is intended to coerce conduct, it is civil in nature. *See also Ward v. Ward,* 261 Ga. 659, 409 S.E.2d 518 (1991), *cert. denied,* 503 U.S. 947, 112 S.Ct. 1503, 117 L.Ed.2d 642 (1992); *Banks v. Wells,* 256 Ga. 164, 344 S.E.2d 652 (1986); *Ensley,* 239 Ga. 860, 238 S.E.2d 920; *cf. In re Campbell,* 185 B.R. 628, 631 (Bankr.S.D.Fla.1995); *see also Rogers,* 164 B.R. at 384–85, 391; *O'Brien,* 153 B.R. 305.

25. In *Rook,* the court reasoned that, although a sentence of incarceration may be suspended during a fixed period of time to exact certain behavior and is subject to the stay, a court may, as the object of punishment, compel obedience to a violated order through a conditional judgment of contempt which becomes absolute in the event the condition is not performed. Hence, in that case when the debtor lost the opportunity to purge himself of the contempt, a citation civil and remedial in nature became criminal and punitive and federal interference was inappropriate. *Rook,* 102 B.R. at 495.

tion of a fixed, unconditional sentence intended as punishment for a completed offense. As long as Debtor complied with this duty, the State Court had no basis to order his confinement under his sentence. In this sense, enforcement of child support through a conditionally suspended sentence in an abandonment case is virtually indistinguishable from civil contempt. The fact that a civil contempt citation for failure to pay child support is generally subject to the automatic stay, as contrasted with criminal contempt, notwithstanding its vindication of important societal interests, supports this Court's determination that the suspended sentence enforcement process, as observed in the present case, is similarly subject to the stay. *See generally Dep't of Human Resources v. Chambers*, 211 Ga.App. 763, 765–66, 441 S.E.2d 77 (1994); *accord Ensley*, 239 Ga. 860, 238 S.E.2d 920; *see also Banks v. Wells*, 256 Ga. 164, 344 S.E.2d 652 (distinguishing civil and criminal contempt).[26]

### E. *Examination of Georgia Law*

### 1. The Interests of the Child are Paramount Under O.C.G.A. § 19–10–1

Although abandonment originated as and continues to be a criminal offense punishable under state law, nonetheless, the predominant concern or emphasis as expressed through the enforcement of this provision over time appears to have shifted from punishing the parent to protecting the interests of the child. In other words, enforcement of child support through this statute is more directed to alleviating the immediate needs of the dependent child as objectively manifest-

ed, than with proving that a parent entertained the requisite subjective criminal intent in abandoning or deserting the child for purposes of punishing said parent. This refocusing of attention has important implications.[27]

Many years ago, Georgia courts construed the offense of abandonment as meaning something more than temporarily neglecting or leaving one's child in a dependent condition. Indeed, it had to be established that the defendant had willfully forsaken and permanently renounced the duties of parenthood. *Gay v. State*, 105 Ga. 599, 31 S.E. 569 (1898); *Jemmerson v. Georgia*, 80 Ga. 111, 5 S.E. 131 (1888). Under such reasoning, the dependency of the child was viewed as a necessary component of the offense but only insofar as it resulted from a parent's intent to sever the parental relation in its entirety with no plans to return. The effects of such logic on dependent children were disastrous.

In *Gay*, this rationale allowed a delinquent father to successfully plead a former conviction as a defense to a subsequent charge of abandonment. 105 Ga. at 600, 31 S.E. 569. In deciding whether a second conviction amounted to punishment for the same offense, the court analyzed whether the law is satisfied when an actual desertion is punished or whether the desertion, willfully persisted in, makes a separate case each day it occurs. Because the law then centered on the father's intent to forsake the child completely, each new charge of abandonment had to be accompanied by a separate act of desertion. Stated differently, the offense is com-

---

**26.** It is argued that revocation of a suspended sentence is criminal in nature because it is meant to assure that the persons sentenced in connection with violations of state law comply with the conditions associated with the suspension of their sentence in furtherance of their own rehabilitation and the protection of society. Further, since the child support provisions are not part of the sentence, revocation cannot be converted into a civil matter. Brief of Amicus Curiae State of Georgia at 17–18, February 22, 1995. As discussed hereinafter, however, the record shows that Defendants were using Debtor's sentence as a remedial device precisely for the purpose of enforcing Debtor's child support obligation as opposed to enforcing his sentence which had not even commenced.

**27.** The inclusion of parental intent as an element of the offense of abandonment may have resulted from the fact that the law originally tended to view the matter solely in terms of the parent's property interests in his child. A parent's duty to his child was based upon his right to the child's custody and his or her services. *See e.g.* O.C.G.A. § 19–7–1 (1991) (formerly codified at Ga.Code Ann. § 74–108 (The Official Code of Georgia became effective in 1982 and replaced the Georgia Code Annotated (Code of 1933)); *see also* Robert S. Stubbs II, A Summary of the Georgia Law of Children § 129, at 285 (1969). Thus, to prove abandonment, physical desertion had to be accompanied by subjective intent to abandon, much as if the child was personal property.

plete when abandonment occurs with the proper intent and, once the deserting parent is convicted and punished, the law is satisfied and the parent cannot again be prosecuted for the same act of abandonment.

The above conclusion required a deserting father to return to his parental duties and again abandon his minor child with the requisite intent before he could be charged for a subsequent abandonment offense. *Gay,* 105 Ga. at 601–03, 605, 31 S.E. 569; *see also Blackwell v. State,* 48 Ga.App. 221, 172 S.E. 670 (1934); *Jemmerson,* 80 Ga. at 113–14, 5 S.E. 131. If the father never returned, the custodial parent had no further recourse under the statute because his continued refusal to provide support following desertion was not considered an offense under the statute. The court in *Gay* commented that the effect of such a ruling upon the suffering child was regrettable; nonetheless, it concluded the abandonment statute "is not a remedial measure in the interest of the child, providing for its maintenance" but "a punitive measure, intended in its enforcement to deter parents from deserting their children and leaving them in the condition described in the statute." *Gay,* 105 Ga. at 603, 31 S.E. 569; *accord Blackwell,* 48 Ga.App. at 223, 172 S.E. 670. Such reasoning, though it leaves the child with little relief, is consistent in terms of abandonment's criminal law origin and its attendant concentration on the rights and duties of the father as opposed to the interests and condition of the minor child. *Accord Weltzbarker v. State,* 89 Ga.App. 765, 81 S.E.2d 301 (1954); *Brock v. State,* 51 Ga.App. 414, 180 S.E. 644 (1935).

Recognizing the practical and unacceptable results of such rulings, later decisions strongly criticized the legal analysis employed in *Gay* and the law eventually changed. For instance, in *Phelps v. State,* 10 Ga.App. 41, 72 S.E. 524 (1911), the court, taking issue with the *Gay* rationale, concluded that a child's dependency vitalizes the offense of abandonment. Thus, intent, a necessary element of any criminal offense, is more properly defined for purposes of abandonment in terms of a parent's willful persistent refusal to support and care for the needs of his child. *Phelps,* 10 Ga.App. 41, 72 S.E. 524; *accord Brown v. State,* 122 Ga. 568, 50 S.E. 378 (1905). Moreover, in 1941, the Georgia legislature, perhaps in response to the invitation extended in *Blackwell,* 48 Ga.App. at 223, 172 S.E. 670, amended former Ga.Code Ann. § 74–9902 (current version at O.C.G.A. § 19–10–1) to provide that abandonment is a continuing offense. Ga.L. 1941, p. 481, 483; *see also* Ga.L. 1946, p. 63.[28] As stated in *Weltzbarker v. State,* 89 Ga.App. at 766, 81 S.E.2d 301, the rationale expressed in cases such as *Gay* and *Blackwell,* no longer constituted grounds for a defense to a second prosecution for abandonment after a former acquittal or conviction, if the child remained in a dependent condition. *See also Nelson v. State,* 77 Ga.App. 255, 257, 48 S.E.2d 570 (1948); *Hall v. State,* 202 Ga. 42, 47–48, 42 S.E.2d 130 (1947).

This Court is not suggesting by the above that a continuing offense is somehow less criminal or that the intent of the deserting parent does not remain an essential consideration under O.C.G.A. § 19–10–1. Inquiry into whether a parent accused of abandonment had the ability to pay or into the cause of a separation and, hence, whether the abandonment was voluntary or willful remains relevant. Similarly, the goals of deterrence and correction of improper behavior are still fundamental and can be addressed through the imposition of appropriate punishment as justified in certain circumstances.

Ultimately, however, the paramount concern of this statutory provision, as currently construed, is the enforcement of the parental duty of support in order that the interests of the child are more completely embraced and protected. The historical shift in the law, from defining criminal intent in abandonment cases strictly in terms of the permanence attached to an act of desertion by a parent to the parent's willful persistent refusal to support his child, resulted from the change in focus of abandonment law through which the priority of the interests of the child and his

---

**28.** Abandonment is a continuing offense which means that a former acquittal or conviction will not bar further prosecution for said offense if a child is again in a dependent condition for another thirty (30) day period. *See* O.C.G.A. § 19–10–1(c).

maintenance was fully recognized. Simply stated, although abandonment is a crime, the emphasis now placed upon the child and his condition through the use of O.C.G.A. § 19–10–1 supports the conclusion that Defendants' attempt to enforce Debtor's abandonment sentence was more in the nature of a remedial, civil measure exercised for the benefit of the child than a punitive or criminal measure designed to punish or deter.[29]

### 2. O.C.G.A. § 19–10–1 Principally Concerned with Enforcement of Preexisting Civil and Moral Duty as Parent

The common law of Georgia has long recognized a father's duty to support his minor child during coverture (the state of marriage) and following a divorce. This duty, first codified in 1863, is currently set forth in O.C.G.A. § 19–7–2 and states that it is "the joint and several duty of each parent to provide for the maintenance, protection, and education of his child...." O.C.G.A. § 19–7–2 (Supp.1995); see also Logue v. State, 94 Ga.App. 777, 779–81, 96 S.E.2d 209 (1956) (reflecting difference of opinion concerning breadth of parental duty covered by abandonment provision).[30] Of course, as discussed herein, a parent not only breaches a moral and civil duty when he fails to support his child but may also be exposed to criminal prosecution under O.C.G.A. § 19–10–1. Although willful abandonment is a crime under state law, in conjunction with the suspended sentence and looming threat of incarceration as experienced in this case, this provision has developed into a powerful coercive aid and

remedy in the enforcement and collection of child support.[31] As held by the Georgia Supreme Court, one of the inherent purposes of O.C.G.A. § 19–10–1 and the enforcement mechanism of the revocable suspended sentence is to ensure that support payments are timely made for the benefit of the dependent minor child. See generally Perini v. State, 245 Ga. 160, 264 S.E.2d 172 (1980).

The statutory scheme of O.C.G.A. § 19–10–1(j) authorizes the state trial court to prescribe the amount of child support to be paid by the defendant, which sum is then used as a condition of the suspension of a sentence of confinement. See Pruitt v. Lindsey, 261 Ga. 540, 407 S.E.2d 750 (1991). Further, the modification provisions of O.C.G.A. § 19–10–1 are comparable to the civil provisions set forth in O.C.G.A. §§ 19–6–17, –18, and –19 (1991 & Supp.1995). In addition, the guidelines of O.C.G.A. § 19–6–15, used in computing child support awards in civil proceedings, are employed in fixing child support as a condition of a suspended sentence. Pruitt; Vogel v. State, 196 Ga.App. 514, 516, 396 S.E.2d 262, 264 (1990). A civil action under O.C.G.A. § 19–6–15, however, may not be brought in Superior Court to modify child support ordered in connection with suspension of an abandonment sentence in State Court. By concentrating supervisory authority in the State Court, the legislature made certain that the coercive power of the suspended sentence "—to ensure that the parent provides support" remains a formidable remedial device. Pruitt, 261 Ga. at 540–41, 407 S.E.2d 750.[32] For these reasons, al-

---

**29.** Another aspect of O.C.G.A. § 19–10–1 and the problematic nature of intent is illustrated in *Helms v. Jones*, 621 F.2d 211 (5th Cir.1980), *rev'd sub nom. Jones v. Helms*, 452 U.S. 412, 416–17, 422–23, 101 S.Ct. 2434, 2438–39, 2442, 69 L.Ed.2d 118 (1981).

**30.** Further, among other provisions, O.C.G.A. § 19–6–15 (Supp.1995) (formerly codified at Ga. Code Ann. § 30–207), which requires that a specific award of child support be set forth in a divorce decree, was enacted in 1870 in recognition of the parental duty expressed in O.C.G.A. § 19–7–2 (formerly Ga.Code Ann. § 74–105) by providing for continuing support following separation or divorce. Section 19–6–15 was intended to remedy the inadequacy of the common law doctrine of necessaries, also arising from the aforesaid duty, whereby a father could be or-

dered to reimburse a third party for expenditures incurred for the welfare of his child. Section 19–6–15 relieved the parent of this common law liability and substituted in its place liability by virtue of a court decree. *Mell v. Mell*, 190 Ga. 508, 510–11, 9 S.E.2d 756 (1940); *see also Thomas v. Holt*, 209 Ga. 133(2), 70 S.E.2d 595 (1952).

**31.** Abandonment charges can be brought against a parent who has only partially complied with a prior alimony and child support decree. *See McCullough v. State*, 141 Ga.App. 840, 234 S.E.2d 678 (1977); *see also Ozburn v. State*, 79 Ga.App. 823, 54 S.E.2d 376 (1949).

**32.** The State Court may increase the amount of child support as previously awarded by a Superior Court in a divorce decree, but such an in-

though O.C.G.A. § 19–10–1 is a criminal statute, as sentence is implemented through subsection (j), it functions as a civil enforcement mechanism to compel performance of a parent's moral and statutory duty to support his child under O.C.G.A. § 19–7–2.[33]

### 3. Child Support as Condition of Suspension of Abandonment Sentence Neither a Penalty Nor Part of a Criminal Sentence

The conclusion that Defendants' enforcement efforts herein were not in the nature of the continuation of a criminal matter is further evidenced by Georgia courts' recognition of the difference between the payment of child support, serving as a condition for the suspension of a sentence in an abandonment case, and the sentence itself. For instance, in *Hudson v. State*, 248 Ga. 397, 283 S.E.2d 271 (1981), the Georgia Supreme Court rejected a defendant parent's challenge to an increase in child support ordered while his sentence was suspended. In that case, the defendant parent entered a plea of nolo contendere to an abandonment charge and his sentence was suspended on condition that he pay monthly child support. Six years later, the amount of child support was increased

but, because the defendant was not in arrears and his sentence was still suspended, he asserted a double jeopardy violation.

A court cannot increase punishment in a criminal matter once a defendant begins to serve his sentence, but the Georgia Supreme Court held that no such violation had occurred for two reasons. First, even though the payment of monthly child support was a condition for suspension of defendant's sentence, this obligation was not in the nature of a penalty or intended as a form of punishment imposed as part of his criminal sentence. Rather, the obligation to pay child support arises from a preexisting moral and statutory duty. The requirement of such support constitutes enforcement of the legal duty set forth in former Ga.Code Ann. § 74–105 (currently O.C.G.A. § 19–7–2) and, accordingly, an increase in support is not a prohibited increase in punishment. *Hudson*, 248 Ga. at 398–99, 283 S.E.2d 271.[34]

Secondly, the child support increase in question had not been improper because the court determined that the defendant had not yet entered upon service of his sentence. *Hudson*, 248 Ga. at 399, 283 S.E.2d 271,

crease is not considered a modification of a civil judgment. *Dorsey v. State*, 145 Ga.App. 750, 245 S.E.2d 31 (1978) (Former Ga.Code Ann. § 27–2709, referenced therein, became O.C.G.A. § 42–8–34.) Cases such as *Dorsey* and *Pruitt*, in describing the relationship between an order to pay child support arising from a civil divorce decree and a subsequent abandonment sentence, illustrate how both the relevant criminal and civil law provisions, though separate, share the same overriding concern in protecting the interests of the child.

**33.** In *Kirchman v. Kirchman*, 212 Ga. 488, 93 S.E.2d 685 (1956), the court stated that a criminal prosecution for abandonment was not a civil remedy to enforce a minor child's right to support. This statement, however, most likely was made in reference to the lack of standing of a child to recover support. Further, although the court eventually held that a remedy could be fashioned using equity jurisdiction, the court seems to have ignored the practice of using the threat of punitive recourse through suspended abandonment sentences as a means of securing such support.

**34.** The court in *Hudson* also held that the 1980 amendment to former O.C.G.A. § 42–8–34(d)(4)

(formerly codified at Ga.Code Ann. § 27–2709(d)(4) and now codified at O.C.G.A. § 19–10–1(j)(4)) was in accord with this principle. *Hudson*, 248 Ga. at 399, 283 S.E.2d 271. (As previously noted, O.C.G.A. § 42–8–34(d)(1)–(4) was moved to § 19–10–1(j) in 1989. Ga.L.1989, p. 381.) The 1980 amendment basically provided that the terms and conditions of support were subject to review and modification and that said amounts could be increased as a condition of the sentence as suspended. Further, any hearing thereon would not be considered equivalent to a probation revocation hearing nor would any modification be deemed a change in sentence or deemed to change the suspended sentence to a probated sentence. *See* O.C.G.A. § 42–8–34(d)(4) now codified at O.C.G.A. § 19–10–1(j)(4); *see also* O.C.G.A. § 19–10–1(j)(3). In addition, in 1989, O.C.G.A. § 42–8–32 was amended to provide that probation supervisors were restricted to collecting funds paid in criminal proceedings in order to shift the burden of collecting child support from the probation department. Ga.L.1989, p. 380; *see also* F. Cullen, Domestic Relations, 6 Ga.State L.Rev. 232 (1989); *accord* 1982 Op. Att'y Gen. 210 (Department of Corrections cannot contract for probation officials to collect funds owed pursuant to Child Support Recovery Act, O.C.G.A. §§ 19–11–1 through –27).

citing *England v. Newton*, 238 Ga. 534, 233 S.E.2d 787 (1977). Under former Ga.Code Ann. § 27–2709(d)(1) and (2) (currently codified at O.C.G.A. § 19–10–1(j)(1) and (2)), service of a suspended sentence in an abandonment case does not commence until suspension is revoked. *Hudson*, 248 Ga. at 400, 283 S.E.2d 271, citing *Jones v. State*, 154 Ga.App. 581, 583, 269 S.E.2d 77 (1980) and *Turnipseed v. State*, 147 Ga.App. 735, 250 S.E.2d 186 (1978). Thus, until the suspension feature of a sentence is revoked and a defendant enters upon service of his sentence by means of either probation or incarceration, child support, imposed as a condition of such suspension, can be increased. *Entrekin v. State*, 147 Ga.App. 724, 726–27, 250 S.E.2d 177 (1978).[35]

Underlying the ruling in *Hudson* is the explicit recognition that orders subjecting child support to future modification protect and serve the established principle of family law regarding the parental duty to support one's child as expressed in O.C.G.A. § 19–7–2. 248 Ga. at 398–400, 283 S.E.2d 271. As later emphasized in *Vogel*, 196 Ga.App. at 515, 396 S.E.2d 262, child support awarded in an abandonment action can be modified because it "is not a part of the sentence, but is a continuing statutory and moral obligation."[36] Significantly, after the defendant parent in *Hudson* was granted a writ of habeas corpus by a federal district court, the Eleventh Circuit reversed the order granting the writ and, relying on the Georgia Supreme Court's interpretation of state law, rejected the contention that the increase in child support constituted a prohibited retroactive application of a criminal measure resulting in the imposition of greater punishment. *See Hudson v. Deyton*, 770 F.2d 1558, 1561–62, reh'g denied, 777 F.2d 704 (11th Cir.1985). In sum, child support, ordered as a condition of the suspension of an abandonment sentence, is neither a form of punishment nor part of a criminal sentence and, although such award arises in connection with a criminal proceeding, which may enhance the enforceability and collectibility of same, this association does not overshadow the continuing remedial nature of this conditional sentence imposed in furtherance of a preexisting civil duty in response to the particular needs of the child.

## 4. Suspension of Sentence Not Equivalent to Probation

The distinction between suspended sentences and probation is further confirmation of the overall civil, remedial purpose of an abandonment sentence suspended on condition of the payment of child support. Suspension and probation may at times appear interchangeable and may serve similar goals such as rehabilitation, but cases such as *Hudson* illustrate their differences. 248 Ga. at 400, 283 S.E.2d 271. Probation is a form of service of a criminal sentence and, as a matter of criminal law, a probated sentence cannot exceed the length of time the defendant would have otherwise served in confinement. *Turnipseed*, 147 Ga.App. 735, 250 S.E.2d 186. On the other hand, service of a suspended sentence does not begin until such suspension is revoked and, consequently, a sentence cannot be simultaneously suspended and probated. *Jones*, 154 Ga.App. at 582–83, 269 S.E.2d 77; *see also Entrekin*, 147 Ga. App. at 724, 250 S.E.2d 177. This distinction has important implications as revealed by an examination of their historical relationship and the resulting separation of suspended sentences from probation.

Georgia courts as well as the Georgia General Assembly have long understood the extraordinary nature of suspended sentences and the uses to which they could and should be employed. Their indefinite or indeterminate nature, however, has always been pro-

---

**35.** The court in *Hudson* distinguished the holdings in *Entrekin* and *England* by noting that the underlying sentences in those cases were either a revoked suspended sentence or a probated sentence, whereas in *Hudson* the sentence had remained suspended. *Hudson*, 248 Ga. at 400, 283 S.E.2d 271.

**36.** Similarly, in further recognition of the true nature of the subject matter therein addressed, the court in *Hudson* approved the wife's efforts to retain private counsel because, although the litigation "arose out of a criminal proceeding, it was ... in the nature of a civil proceeding to determine the proper amount of the defendant's statutory child-support obligation." *Hudson*, 248 Ga. at 400, 283 S.E.2d 271.

blematic. As explained in *Wood v. State*, 68 Ga.App. 43, 49–50, 21 S.E.2d 915 (1942), before 1933, judges suspended criminal sentences in all types of misdemeanor cases. Although no authority existed which permitted this practice, there was no law prohibiting it. As a result, the effect of such sentences was unclear and, as observed in cases such as *Neal v. State*, 104 Ga. 509, 30 S.E. 858 (1898), convicted defendants could be ordered to serve an entire sentence many years after the expiration of the term originally specified therein. *Wood*, 68 Ga.App. at 49, 21 S.E.2d 915.

It was this evil, the court noted, that the Georgia legislature sought to address in 1933 by creating a definite termination point for suspended sentences in misdemeanor cases by providing they would have the same effect as if a defendant had been placed on probation. *See* Act of March 24, 1933 (Ga.L.1933, p. 266, former Ga.Code Ann. § 27–2706); *Wood*, 68 Ga.App. at 50, 21 S.E.2d 915. The 1933 Act, however, expressly excluded abandonment cases from its operation. Whether or not this exclusion was intended to signal approval of the established practice of using suspended sentences in abandonment cases, such practice was subsequently struck down in *Aldredge v. Potts*, 187 Ga. 290, 200 S.E. 113 (1938).[37] In *Potts*, the court held, using reasoning similar to that in *Neal*, that orders suspending sentences in abandonment cases were void. *Potts*, 187 Ga. at 290–91, 200 S.E. 113. The ruling in *Potts* probably precipitated the amendment in 1941 to former Ga.Code Ann. § 27–2707. *See* Ga.L. 1941, p. 481; *see also Clarke*, 196 Ga. at 134, 26 S.E.2d 362.[38] This amendment, among other things, authorized suspension of sentences in abandonment cases pending a child's minority. *See also Popham v. Spears*, 204 Ga. 759, 51 S.E.2d 845 (1949).[39] By reason thereof, problems arising from the indefinite duration of a suspended sentence were effectively eliminated by establishing a specific time limitation defined in relation to the minority of the dependent child.

Although this provision was apparently never successfully challenged, the Georgia legislature enacted the Statewide Probation Act of 1956 and changed the treatment of suspended sentences in abandonment cases.[40] In this act, suspension was expressly interwoven with probation. Yet, almost immediately, new problems arose in the wake of *Harris v. Grimes*, 215 Ga. 373, 110 S.E.2d 747 (1959), in which the Georgia Supreme

37. Further, in *Cox v. State*, 85 Ga.App. 702, 70 S.E.2d 100 (1952), the court addressed compliance with conditions of suspended sentence relating to a previous abandonment conviction. Because suspension provisions were void (*Neal*, 104 Ga. 509, 515, 30 S.E. 858), compliance was not a good defense as a matter of law. Compliance may, however, be relevant to the extent it shows whether there was a willful, voluntary desertion. The sentence at issue in *Cox* preceded the 1941 amendment authorizing such suspensions. *See* Ga.L.1941, p. 481.

38. Ironically, as a result, the defendant in *Potts* had to serve his full sentence years after the original term had expired. Similarly, in *Clarke v. Carlan*, 196 Ga. 130, 133–35, 26 S.E.2d 362 (1943), the court followed the holding in *Potts* and concluded that suspended sentences were void despite longstanding custom in abandonment cases. The court further determined that the 1941 amendment was not retroactive and that the sentence at issue therein was not converted to a probation sentence even though the defendant had been referred to a probation officer for supervision. *Clarke*, 196 Ga. at 135, 26 S.E.2d 362.

39. The 1941 amendment to Ga.Code Ann. § 74–9902 (currently at O.C.G.A. § 19–10–1) also provided that abandonment is a continuing offense. Evidently, the state legislature was attempting to strengthen the abandonment offense as an effective means for enforcing the underlying parental duty of support. Ga.L.1941, p. 481.

40. In the 1956 Act, among other things, the legislature repealed former Ga.Code Ann. § 27–2702 (power of court to place offenders on probation), § 27–2706 (suspension of sentence, effect), and § 27–2707 (suspension of sentences in abandonment cases). These provisions were reenacted with certain changes, principal among them, for present purposes, being Sections 8, 13, and 14 which are generally summarized as follows:

Section 8—court may stay and suspend and may place defendant upon probation, probation period not to exceed maximum sentence of confinement;

Section 13—suspended sentences have the effect of placing defendant on probation;

Section 14—in abandonment cases where defendant has been placed on probation, court may provide for suspended sentence terms providing for child support during minority. *See* Ga.L. 1956, p. 27.

Court construed Section 14 of the 1956 law (former Ga.Code Ann. § 27–2715 and currently codified at O.C.G.A. § 42–8–32 (1994)). Because a suspended sentence now had the effect of placing a defendant on probation (Ga.L.1956, p. 27, § 13; former Ga.Code Ann. § 27–2714 and currently codified at O.C.G.A. § 42–8–39 (1994)), and since a period of probation could not exceed the maximum time that a defendant could be incarcerated (Ga.L. 1956, p. 27, § 8; former Ga. Code Ann. § 27–2709 and currently codified at O.C.G.A. § 42–8–34 (1994)), the court held a trial judge could not revoke a suspension after the term of the original sentence had expired. 215 Ga. at 374, 110 S.E.2d 747. Though *Grimes* addressed the offense of bastardy, its holding seriously diminished the usefulness of suspending sentences in abandonment cases. Based upon an amendment enacted in 1960, however, when subsequently confronted with its prior ruling, the Supreme Court held *Grimes* was no longer controlling because trial judges now had authority to revoke a suspension in an abandonment case and could order service of the entire sentence years after the sentence, by its original terms, had lapsed. *See Daniel v. Whitlock,* 222 Ga. 192, 194–95, 149 S.E.2d 79 (1966), citing Ga.L. 1960, p. 1148.[41]

From the foregoing, it is apparent that over the years Georgia courts and the Georgia General Assembly have wrestled with issues pertaining to suspended sentences in abandonment cases and, as the law has evolved, suspension has now been conspicuously set apart from probation. As observed in *Jones,* allowing a sentence to be suspended and probated at the same would defeat an underlying purpose of conditional suspension following an abandonment conviction, which is to assure the payment of child support until the child reaches majority. 154 Ga. App. at 583, 269 S.E.2d 77. Hence, this intentional separation, principally through legislative amendments, has occurred precisely in order to preserve the effectiveness, in terms of enforcement and flexibility, of suspending sentences conditioned on payment of child support, which would not be permissible if suspended sentences in abandonment cases were treated like probated sentences. This divergence between probation and suspension clearly demonstrates that the actions of Defendants herein, taking place against this specially crafted statutory background, were more closely aligned with and properly identified as enforcement of a civil obligation than with the enforcement of a criminal sentence.[42]

### 5. Georgia Law Summarized

The obligation of Debtor to pay child support was originally compelled by the terms of

**41.** It is not clear why the state legislature folded suspension under probation in the 1956 Statewide Probation Act, especially since there appeared to be no need for same. In any event, the problem engendered thereby was resolved in 1960 by an amendment to Section 8 of the 1956 law, which provided that the duration of the term of a suspended sentence in an abandonment case could not exceed the period of the child's minority. Ga.L.1960, p. 1148. This language was similar to that previously used in the 1941 provision. *See Daniel,* 222 Ga. at 194, 149 S.E.2d 79. The 1960 amendment to Section 8 further provided that service of a suspended sentence could be ordered at any time pending minority and Section 13 was amended to provide an exception in abandonment cases. Ga.L.1960, p. 1148. (Later, in 1965, Section 13 was amended by providing that suspension did not have the same effect as probation and the abandonment omission language was itself omitted. Ga.L. 1965, p. 413.)

In addition, as observed in the non-abandonment decision of *Cross v. State,* 128 Ga.App. 774, 197 S.E.2d 853 (1973), in 1964, former Ga.Code Ann. § 27–2502 (currently O.C.G.A. § 17–10–1 (Supp.1995)) was reenacted to provide that judges had authority to revoke suspended sentences and order service of sentence, which disposed of the argument that courts lacked such power unless said sentence was treated as a probated sentence. *See* Ga.L.1964, p. 483, §§ 2 and 4.

**42.** The foregoing conclusion is further supported by enactment of O.C.G.A. § 19–10–1(j)(3) and (4). *See* Ga.L.1980, p. 1136 (formerly O.C.G.A. § 42–8–34(d) and Ga.Code Ann. § 27–2709(d)); *accord Hudson,* 248 Ga. at 399, 283 S.E.2d 271. These subsections specifically provide that a single abandonment sentence may be suspended more than once without precipitating probationary constraints or limitations. As a result of such provisions, maximum flexibility is maintained in terms of fixing, modifying, and enforcing child support by allowing for adjustments to the amount of child support and through the ability to continually revoke and reinstate suspension as deemed necessary in order to enforce such child support obligations.

his civil divorce decree and is based upon his antecedent moral and legal duty as a parent as expressed in O.C.G.A. § 19–7–2. Enforcement of such obligation through a suspended sentence and an accompanying threat of incarceration as a result of an abandonment conviction under O.C.G.A. § 19–10–1 does not convert the character of Debtor's parental duty into a criminal matter. As revealed by the above analysis of Georgia law, the payment of child support, though imposed as a condition for suspension of Debtor's sentence, was neither part of said sentence nor a monetary penalty. Further, although a suspension revocation hearing was scheduled to determine whether Debtor was in compliance with the terms upon which his sentence had been suspended, and although such a determination is admittedly a serious matter in the state criminal process, the order to pay child support was not an alternative form of criminal punishment like a restitutionary obligation assessed as a special condition of probation.

Defendants' enforcement efforts took place in the context of a deliberately constructed statutory design whereby suspended sentences, conditioned upon payment of child support, are unimpeded by various constitutional and statutory protections associated with the imposition of punishment through incarceration and insulated from the constraining effects of probation. *See* O.C.G.A. § 19–10–1(j).[43] The purpose of the hearing sought through the filing of the second suspension revocation petition by Defendants was not so much to enforce Debtor's sentence of incarceration as it was to enforce compliance with the nonpunitive condition by which commencement of such sentence was suspended. *Accord* Tr. 1 at 119–20 (Camp-

bell).[44] The fact that suspension was conditional, that the benefit produced by same inured to the benefit of another who was not a party, and that the condition of suspension was directly proportionate (and even determined in reference) to the need at hand, all tend to show that Defendants' efforts were reasonably calculated to serve a remedial purpose in the public interest.

In sum, Defendants' efforts in policing the terms of suspension of Debtor's sentence, though arising in connection with a criminal proceeding, were specifically conscripted into serving the interests of Debtor's minor child. Consistent with the purpose of O.C.G.A. § 19–10–1, Defendants sought revocation of Debtor's suspended sentence to coerce payment of child support through the threat of punishment. As such, the revocation sought by Defendants was not criminal in character and their attempt to collect child support was not transformed thereby into the continuation of a criminal proceeding under 11 U.S.C. § 362(b)(1), no matter how well-intended. For all of the above reasons, the Court finds and concludes, as previously indicated, that Defendants' filing of the second revocation petition violated the automatic stay and is not an exception under 11 U.S.C. § 362(b)(1).

### F. *Willfulness of Defendants' Stay Violation*

██ Having concluded that Defendants violated the automatic stay and that their conduct is not subject to an exception thereto, the Court must now determine whether this violation was willful such that damages must be awarded in accordance with 11 U.S.C. § 362(h). Throughout these proceedings, Defendants have asserted the stay has

---

43. Of course, if a state court requires a defendant to serve a fixed period of confinement not conditioned on such payment, it may be intended to serve as punishment as well as a stronger form of coercive aid. In that situation, the matter may well be criminal and not subject to the automatic stay. *Accord Rogers*, 164 B.R. at 385, 391.

44. The Court is aware of authority stating that revocation of probation is not criminal in nature and, therefore, does not implicate double jeopardy concerns because a sentence of conditional liberty has already been imposed. *See generally Dutton v. Willis*, 223 Ga. 209, 154 S.E.2d 221 (1967); *Jonas v. Wainwright*, 779 F.2d 1576

(11th Cir.), *cert. denied*, 479 U.S. 830, 107 S.Ct. 115, 93 L.Ed.2d 62 (1986). Although such revocation is similar to revocation of a suspended sentence and seems to fit within 11 U.S.C. § 362(b)(1), and although rehabilitation of a parent is undoubtedly a goal of suspended sentences imposed under O.C.G.A. § 19–10–1, because such suspension is expressly tied to the minority of the child and intentionally separated from probation, this Court concludes that enforcement of same is principally meant to coerce compliance with the civil, parental duty expressed in O.C.G.A. § 19–7–2.

no legal effect upon their efforts to enforce court orders in child abandonment cases. They have never denied prior knowledge of Debtor's bankruptcy case with respect to the filing of the second revocation petition. Instead, Defendants decided to force the issue by intentionally filing such petition and pursuing this matter as a test case. Defendants were very clear in their testimony that they were not interested in participating in any bankruptcy case and just wanted to get on with enforcing the payment of child support. Tr. 2 at 20–21 (Campbell).[45] Thus, the evidence clearly establishes that they knowingly assumed the risk that such action was not excepted from stay.

Such pressure as brought to bear on the Debtor through his possible loss of liberty, which in effect forces him to pay a child support arrearage from property of the estate, is a clear violation of the automatic stay. *See Farmer,* 150 B.R. at 69. Having acted knowingly and intentionally in disregarding the automatic stay by proceeding with the second petition for revocation of Debtor's suspended sentence, and having been erroneous in their conclusion regarding the stay's applicability to such action, the Court concludes Defendants willfully violated the automatic stay and are responsible for the damages associated therewith, including attorney's fees. *See generally In re Lile,* 103 B.R. 830, 837 (Bankr.S.D.Tex.1989), *aff'd sub nom. United States v. Lile,* 161 B.R. 788 (S.D.Tex.1993), *aff'd in part mem.,* 43 F.3d 668 (5th Cir.1994); *accord James v. Moore (In re James),* 150 B.R. 479, 485 (Bankr. M.D.Ga.1993).

## G. *Qualified Immunity*

▮▮▮▮ Defendants further contend, even if the Court concludes that their actions furnish the basis for a willful violation of the automatic stay, that they are nonetheless entitled to qualified immunity for discretionary acts in the performance of their official duties.[46] Qualified immunity shields government officials in their individual capacities from civil liability in performing discretionary acts, except when their conduct violates a clearly established statutory or constitutional right. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Adams v. Poag,* 61 F.3d 1537, reh'g denied, 70 F.3d 1287 (11th Cir. 1995); *Lassiter v. Alabama A & M Univ. Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc); *Cummings v. DeKalb County,* 24 F.3d 1349 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 901, 130 L.Ed.2d 785 (1995). Such a right is clearly established when the unlawfulness of the government actor's conduct in regard thereto is apparent in light of preexisting law. The touchstone for this inquiry is the objective legal reasonableness of the conduct in question as in whether all reasonable governmental actors would have known that the challenged conduct violates federal law. *Adams,* 61 F.3d at 1542–43; *Lassiter,* 28 F.3d at 1149–50; *see also Anderson v. Creighton,* 483 U.S. 635, 639–41, 107 S.Ct. 3034, 3038–40, 97 L.Ed.2d 523 (1987).

Applying this strict standard, the Court does not understand how Defendant Smith could complete his legal research and convince Baker and Campbell that they could threaten Debtor with incarceration for failure to pay child support after the filing of his bankruptcy petition without seeking prior clarification and/or approval from any court. The applicable law had been sufficiently developed such that it should have been reasonably obvious to any government actor, in the circumstances presented, that filing the second revocation petition would result in a violation of the automatic stay. Thus, the Court finds and concludes that Defendants are not entitled to a defense based upon qualified immunity and, further, because they were acting individually, any damages awarded herein will be awarded on a joint and several basis.

## H. *Concluding Observations*

Finally, the Court offers a few observations. Defendants understand that they

---

45. Campbell acknowledged that it was only at the urging of counsel for Defendants herein that a proof of claim was finally filed on September 20, 1993.

46. As previously noted, Defendants have abandoned their sovereign immunity defense.

have at their disposal the power to pressure delinquent parents and produce the desired result of assisting custodial parents and dependent children in Cobb County. As Campbell testified, Debtor's arrearage constituted the primary basis of their allegations in the revocation petitions that Debtor had committed a violation of criminal law and revocation proceedings are a kind of "last-ditch effort" to get child support to custodial parents. Without question, such a process has a highly commendable goal in which society has expressed substantial interest and concern, but the worthiness of child support enforcement is not in dispute. The issue herein centers upon whether Defendants' enforcement of Debtor's child support obligation following his initial plea and sentencing in an abandonment action essentially becomes a government sponsored administrative collection process, especially given the manner in which warrants can be issued and recalled without any judicial intervention, that exploits the heavy club of jail time to enforce a civil, moral duty.

Smith asserted his position is simply that Debtor is supposed to support his child and he viewed Debtor's bankruptcy filing as another attempt to avoid his responsibility. Describing the tension he perceives to exist between performance of this duty and the bankruptcy process, Smith argued that persons such as Debtor should not be allowed to avoid their obligations as a parent and children should not have to wait in line with other claimants in the bankruptcy court. Tr. 3 at 51, 60–64, 69–70, 107–14, 120, 124, 126, 129. Had Defendants merely sought relief from the stay in this Court in the manner provided by Congress, they could have fully asserted their contentions and concerns and, if appropriate, relief would have been granted as requested. Moreover, such efforts could have been pursued without the prospect of liability for damages and attorney's fees if relief was not warranted. Instead, Defendants were intent upon challenging and attempted to circumvent the entire bankruptcy process by claiming authority to decide on their own whether Debtor should be threatened with incarceration by the filing of the second revocation petition.

 It is this Court—not Ms. Campbell, not Mr. Baker, and not Mr. Smith, however, that is entrusted by law with the responsibility of determining how such matters interact with, and the extent to which they are governed by, the automatic stay and any exceptions thereto. Defendants' presumption that the automatic stay displaces the important state interests implicated herein is inaccurate because such interests may be vigorously asserted and prosecuted in relation to a debtor in bankruptcy within the parameters of 11 U.S.C. § 362. Given the grave repercussions of violating the stay, the proper course of action is to seek relief in this Court before engaging in collection efforts. *See Carver,* 954 F.2d at 1577–78; *Rogers v. Overstreet,* 164 B.R. at 388; *Dexter v. Grove (In re Dexter),* 116 B.R. 92, 94–95 (Bankr.S.D.Ohio 1990); *Brock v. Barlow (In re Brock),* 58 B.R. 797, 804 (Bankr.S.D.Ohio 1986).

Defendants' decision to file the second revocation petition, whether in a calculated disregard for or direct challenge to federal bankruptcy law, seems to have been driven by either a misunderstanding of the Chapter 13 process or a determination that bankruptcy unreasonably interferes with the full exercise of their duties, which they have expanded into some kind of mandate. Whatever the reason, from the outset it seems as though Defendants, or some of them, have adopted a belligerent attitude toward the entire bankruptcy process.

Solicitor Smith's declaration in these proceedings that his only concern is for the children is apparently meant to prove he alone is concerned with and acts in the interests of the children in the encounter between child support enforcement and bankruptcy. As a corollary to this assertion, Smith seems to be implying that anyone challenging him or questioning the manner in which he discharges his duties must therefore necessarily be, at best, indifferent to the welfare of such children in Cobb County. Such statements are unfortunate and perhaps some people will be tempted to draw inferences along the lines he suggests. Defendants seem to have confused the scope of their own decisionmaking authority with the merit of the underlying subject matter of their commission. Ab-

sent special circumstances, none of which are evident herein, claims of superior moral concern cannot be used as authorization or license for one particular person or group to disregard the bankruptcy automatic stay and the existing legal procedure for obtaining relief therefrom.

Crusades mounted in the name of children have enormous emotional appeal but, upon closer examination, the initial attraction of same as directed against the bankruptcy process by Defendants herein is revealed as being misguided. First of all, this Court does not stand in an adversarial posture as against any state or county child support enforcement authority. Further, the problems associated with unpaid child support are serious enough and large enough to demand the combined efforts of both state officials and bankruptcy courts working together within the bounds of the law. Moreover, there is absolutely no basis to presume that innocent children and custodial parents will be callously stripped of any recourse to state court ordered support as a result of a payor/parent's bankruptcy filing. As evidenced by the structural protections for child support built into the Code, Chapter 13 is in no way intended to relieve a debtor of his obligation to support his minor children and custodial parents as well as state and local authorities have various means at their disposal for protecting the beneficiaries of child support when a parent files for relief under Chapter 13. *See Heflin v. Heflin (In re Heflin)*, 145 B.R. 560, 563 (Bankr.S.D.Ohio 1992); *In re Raboin*, 135 B.R. 682, 685 (Bankr.D.Kan.1991).[47]

One of the fundamental precepts of the law is to provide form and order. Such a principle necessitates the untangling of various state and federal statutory and judicial mandates with seemingly irreconcilable goals and priorities that come into conflict when a parent such as the Debtor herein files for federal bankruptcy protection amidst the collection of unpaid child support. Undoubtedly, substantial state interests are implicated in such a situation and this Court has no intention of providing a haven for delinquent

parents attempting to escape either their obligation to pay child support or the consequences of their failure to do so. *Accord Sims*, 101 B.R. at 53; *Rogers*, 164 B.R. at 390. Far from impeding the enforcement of child support obligations, adherence to the procedure provided in the Bankruptcy Code for obtaining an order lifting the automatic stay in appropriate circumstances vindicates and reaffirms such interests.

In the end, questioning the disposition of bankruptcy courts toward children in need neither helps the situation nor the children. Perhaps if Defendants had been more conversant in the procedures and remedies provided in the Bankruptcy Code and less inclined to assert and defend ultimate positions through litigation, the present situation would not have developed as it did wherein the Court must award damages, including attorney's fees, for willful violation of the automatic stay. Simply stated, the confrontation deliberately brought about by Defendants herein was unnecessary and unproductive in terms of increasing the protections already afforded to minor children entitled to child support from a parent who has sought bankruptcy relief.

### III. Damages Award

The Court, having determined that Defendants herein willfully violated the automatic stay as provided in 11 U.S.C. § 362(h), **awards** Debtor the total sum of three hundred and fifty dollars ($350.00), consisting of an award of two hundred and thirty dollars ($230.00) for emotional and other stress related matters that Debtor testified he endured, and an award of one hundred and twenty dollars ($120.00) in actual damages for lost wages. Further, the Court **awards** Debtor all costs in this matter. The violations in question were willful but not egregious or malicious and Defendants should be complimented in this instance in that they immediately decided not to go forward in State Court. Accordingly, no punitive damages will be assessed against them.

47. *See also In re Bunn*, 170 B.R. 670, 674–75 (Bankr.D.Minn.1994); *Walter*, 153 B.R. at 40; *James*, 150 B.R. at 486; *Gaertner*, 143 B.R. at 813, 815; *cf.* 11 U.S.C. § 1328(a)(2).

With regard to Debtor's request for reasonable attorney's fees and expenses in this matter, the Court finds and concludes, for the reasons stated hereafter, that the sum of $14,690.50 in attorney's fees and $1,994.68 for reimbursement of expenses is appropriate.

Debtor's counsel filed an application for compensation and enhancement of fees requesting an allowance of attorney's fees in the amount of $36,690.50 plus $18,345.25 as enhanced under a lodestar multiplier for a total fee of $55,035.75 and reimbursement of expenses in the amount of $1,994.68. Although 11 U.S.C. § 362(h) authorizes an award of attorney's fees, it provides little guidance concerning applicable standards. Accordingly, reference to provisions such as 11 U.S.C. §§ 330 and 331 is appropriate. *See In re Price,* 143 B.R. 190, 192 (Bankr. N.D.Ill.1992), *aff'd sub nom. United States v. Price,* 176 B.R. 807 (N.D.Ill.1993), *aff'd and remanded,* 42 F.3d 1068 (7th Cir.1994). Under this standard, counsel must show that his services were actual, necessary, and reasonable. The burden is on counsel to substantiate a fee request and the Court has discretion to award reasonable compensation under the circumstances following an independent assessment of the fee application.

The principles governing allowance of attorney's fees are stated in *Norman v. Housing Authority of City of Montgomery,* 836 F.2d 1292, 1299 (11th Cir.1988), in which the Eleventh Circuit adopted the "lodestar" approach. *See generally Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *see also Pennsylvania v. Delaware Valley Citizens' Council,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). The analysis set forth in *Norman,* 836 F.2d at 1299, includes evaluation of the factors originally expressed in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). *See also Loranger v. Stierheim,* 10 F.3d 776, 781 n. 6 (11th Cir.1994). Under the "lodestar" approach, reasonable hourly rates are multiplied by a reasonable expenditure of hours. Once the "lodestar" is determined, it may be adjusted based on the results obtained.

Automatic stay violations are serious matters as evidenced by Section 362(h) and the suit herein served to vindicate important concerns. Debtor's counsel pursued this matter zealously and the Court certainly does not want to chill such efforts. Further, although Defendants did not continue to pursue this matter in state court, their litigation posture contributed to the fees generated in this case. Counsel has a duty to mitigate his client's damages, including fees, and Debtor's counsel certainly appears to have attempted to settle this matter by suggesting that Defendants file a motion for relief from stay. Instead, Defendants refused and decided to push forward and "test the waters." In so doing, they effectively eliminated the ability of counsel to resolve this dispute upon reasonable terms, which could have avoided the resulting litigation concerning the automatic stay violation.

Notwithstanding the foregoing, after consideration of the fee application, briefs, and argument presented at the hearing on this issue, the Court concludes that an award of the total fees requested is unwarranted. The hourly rates presented, reflecting counsel's skill and experience, appear reasonable and within the range of prevailing community rates. Counsel provided quality legal services on behalf of his client and represented him well in these proceedings. Further, Debtor's counsel was forced to act on an expedited basis in representing this Debtor who has little, if any, means to pay the fees in question. The relatively minimal amount of damages awarded to Debtor and the lack of factual complexity in this matter, however, coupled with the expenditure of an excessive amount of time representing the Debtor herein, strongly suggest a substantial reduction is appropriate.

Although Section 362(h) authorizes the shifting of reasonable fees that may be incurred, any such award is part of a debtor's actual damages and should be closely scrutinized based on all the circumstances. The key question presented is whether the value of the services rendered was truly worth the amount of the fees requested. Based upon the Court's review of the pleadings in this matter and its observations of counsel at

trial, in this Court's opinion, Debtor's counsel exhibited a lack of focus on the precise issue presented for determination which resulted in excessive briefing as well as additional and unnecessary trial time. The amount of time spent by Debtor's counsel was not justified by the economics of this case nor was it reasonable and necessary to protect the interests of Debtor.

 In sum, it was simply unnecessary to spend nearly 200 hours in prosecuting this matter and this Court cannot justify shifting the total amount requested to Defendants. Based on the record and this Court's own knowledge and experience, the Court concludes that the value of the services provided in their totality is lacking consonant with the above standards and a substantial reduction is proper. *Accord Norman,* 836 F.2d at 1303. Similarly, consistent with the foregoing, an enhancement or bonus is appropriate only in rare circumstances. Admittedly, Debtor's counsel achieved a favorable result for his client, but again, given the amount of damages sustained and the lack of factual complexity confronted by counsel herein, the Court concludes that an enhancement is not warranted under the circumstances. The balance of the fee request should be further reduced by the amount of $22,000.

Accordingly, as authorized by 11 U.S.C. § 362(h), the Court finds and concludes, as previously indicated, that an award of $14,-690.50 is reasonable and the Court **awards** same to Debtor to be paid directly to his counsel. In addition, the Court **awards** Debtor the sum of $1,994.68 as reimbursement of expenses reasonably incurred, said amount also to be paid directly to his counsel.

The Clerk is directed to serve a copy of this Order upon counsel for Plaintiff, counsel for Defendants, and the Chapter 13 Trustee.

**IT IS SO ORDERED.**